**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANNA RUSSELL, ) | **ELECTRONICALLY FILED** |
| ) | |
| *Plaintiff*, ) | **Case No.** 2:24-cv-98 |
| ) | |
| vs. ) | |
| ) | |
| IHOP RESTAURANTS, INC., ) | |
| ) | |
| *Defendant*. ) | **JURY TRIAL DEMANDED** |
| ) | |

<u>**COMPLAINT IN CIVIL ACTION**</u>

Plaintiff, Anna Russell (hereinafter, "<u>Plaintiff</u>"), by and through the undersigned counsel, now files the within Complaint in Civil Action against Defendant, IHOP Restaurants, Inc. (hereinafter, "<u>Defendant</u>"), and avers as follows:

<u>**PARTIES**</u>

1.     During her employment with Defendant, Plaintiff was forced to endure discriminatory treatment on the basis of her race, which compromised her basic human rights, resulted in emotional distress as she performed job duties, deprived Plaintiff of lost wages, and ultimately served as the substantial motivating factor for her wrongful termination.  Premised on the facts below, Defendant flagrantly violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (hereinafter, "<u>Title VII</u>") and the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.* (hereinafter, the "<u>PHRA</u>").

2.     Plaintiff is an adult individual who resides at 1535 Grant Street, Braddock, Pennsylvania 15104.  Ms. Russell's race and/or ethnicity is African American.  Notably, when Defendant hired Plaintiff, Plaintiff was pregnant.

3.      Defendant is a foreign business incorporated in the State of Delaware that utilizes Prentice-Hall Corporation System, Inc. as its commercial registered agent, with an address located at 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110.  As an approximate measure, Defendant has one-thousand six-hundred eighty-seven (1,687) locations internationally, and twenty-eight (28) of them are situated in the Commonwealth of Pennsylvania.  At all times relevant here, Plaintiff was employed at Defendant's establishment located at 4656 Browns Hill Road, Pittsburgh, Pennsylvania 15217 (hereinafter, the "Facility").

## JURISDICTION AND VENUE

**A.      This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331 and Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367.**

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (hereinafter, "Title VII") (collectively, Plaintiff's claims arising under Title VII are identified as the "Federal Law Claims").

2.      Plaintiff is also advancing claims under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.* (hereinafter, the "PHRA") (the "State Law Claims").  This Court may exercise supplemental jurisdiction over the State Law Claims pursuant to 28 U.S.C. § 1367(a) as the Federal Law Claims and the State Law Claims share operative facts that support the corresponding causes of action within the Federal Law Claims and the State Law Claims.  Further, the operative facts between the Federal Law Claims and the State Law Claims mirror one another to such a degree that they form the "same case or controversy" under Article III § 2 of the United State Constitution which further supports this Court's exercise of supplemental jurisdiction over the State Law Claims.

**B.** **The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

3.     Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (the "Western District") as a substantial part of the events and omissions giving rise to the Federal Law Claims and State Law Claims occurred within this judicial district.  Specifically, these events and omissions occurred within Allegheny County, Pennsylvania which is one of the counties encompassed by the Western District.  This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in Allegheny County, Pennsylvania and conduct arising within Allegheny County is docketed within the Pittsburgh Division of the Western District pursuant to LCvR 3.

**C.** **This Court May Exercise Personal Jurisdiction Over Defendant through Pennsylvania's Long-Arm Statute and This Exercise of Personal Jurisdiction Comports with the Traditional Notions of Fair Play and Substantial Justice.**

4.     This Court may exercise personal jurisdiction over Defendant as Defendant has the required minimum contacts with this forum for purposes of Pennsylvania's Long-Arm statute codified within 42 Pa. C.S. § 5322.  Further, the exercise of jurisdiction over Defendant by and through Pennsylvania's Long-Arm Statute complies with the traditional notions of fair play and substantial justice required by the Due Process Clause of the Constitution given the "specific jurisdiction" that exists over Defendant.

5.     At the outset, Pennsylvania's Long-Arm statute provides that a tribunal may exercise personal jurisdiction where an individual or entity is "transacting any business in this Commonwealth".  42 Pa.C.S. § 5322.

6.     The following enumerated subsections within 42 Pa. C.S. § 5322(a) define "transacting any business" to include:

(1)(i) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an act.

(1)(ii) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.

(1)(iv) The engaging in any business or profession within this Commonwealth, whether or not such business requires license or approval by any government unit of this Commonwealth.

(1)(v) The ownership, use or possession of any real property situate within this Commonwealth.

(3) Causing harm or tortious injury by an act or omission in this Commonwealth

(5) "having an interest in, using, or possessing real property in this Commonwealth

(10) committing any violation within the jurisdiction of this Commonwealth of any statue, home rule charter, local ordinance or resolution, or rule or regulation promulgated thereunder by any government unit or of any order of court or other government unit."

*Id.*

7.    In the instant matter, personal jurisdiction can be found over Defendant under Pennsylvania's Long-Arm Statute for the following reasons:

a.    Defendant maintains numerous retail business establishments within the Pittsburgh, Pennsylvania region, and routinely engages in various commercial activities within the Commonwealth of Pennsylvania for the purpose of pecuniary gain; and

b.    As averred more fully below, Defendant violated numerous statutory provisions of federal and state law and the underlying events giving rise to Defendant's unlawful conduct, including the harm that Plaintiff sustained therefrom, occurred in Pennsylvania.

8.    This Court's exercise of personal jurisdiction over Defendant by and through Pennsylvania's Long-Arm Statute comports with the Due Process Clause of the Constitution

through the "specific jurisdiction" that exists over Defendant as the causes of action complained of herein arise specifically from Defendant's contact with the forum.  U.S. Const. amend XIV, § 1

9.      The inquiry into whether "specific jurisdiction" exists possesses three parts. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007).  First, a "defendant 'must have purposefully directed [its] activities' at the forum".  *Id.* quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).  Second, the instant litigation must "arise out of or relate to at least one of those activities".  *Id.* quoting *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414 (1984).  And third, whether the exercise of jurisdiction "'comport[s] with fair play and substantial justice'".  *Id.* quoting *Burger King*, 471 U.S. at 476.

10.     Defendant has engaged in business operations for pecuniary gain within the forum and these business operations were, at all times relevant hereto, intentionally effectuated by the Defendant.  As more thoroughly delineated below, Plaintiff participated in these business operations, through an employment relationship, and correspondingly the Federal Law Claims and the State Law Claims arise from said relationship.  Further, the Federal Law Claims and the State Law Claims arose because of these business operations and from the unlawful activity Defendant engaged in occurred within the scope of these operations.

11.     The exercise of personal jurisdiction exists over Defendant and complies with the notions of "fair play and substantial justice" required by *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Given the operative facts occurred within this forum, the evidence and witnesses supporting both the Federal Law Claims and the State Law Claims are located primarily here.  As such, this forum offers both Plaintiff and Defendant the most convenient and effective relief opposed to other forums and ensures each party may fairly access the evidence to support its claims and/or defenses.

12.     Therefore, personal jurisdiction over Defendant is proper in light of Defendant's consent to personal jurisdiction and Pennsylvania's Long-Arm Statute and Defendant may properly be pursued before this Court.

**D.     Plaintiff has exhausted its administrative remedies and the Federal Law Claims and the State Law Claims are now properly able to be brought before this Court.**

13.     Plaintiff has satisfied all procedural and administrative prerequisites under 29 U.S.C. § 626, 42 U.S.C. § 2000e-5, and 43 P.S. § 959 and now may proceed to bring this action before the Court.  Specifically:

a.     On March 27, 2023, Plaintiff dual filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") seeking redress for the Federal Law Claims and the State Law Claims at charge number 533-2023-01371 (the "EEOC Charge") and with the Pennsylvania Human Relations Commission (the "PHRC").

b.     On November 7, 2023, the EEOC issued the Determination and Notice of Rights (the "DNR"), wherein Plaintiff was afforded ninety days within which to timely file the Federal Law Claims and the State Law Claims.  A true and correct copy of the DNR is attached hereto, made a part hereof, and identified as **Exhibit A**. The instant Complaint is filed within the ninety-day time period.

<u>**GENERAL ALLEGATIONS**</u>

14.     On or about October 2021, Plaintiff commenced her employment with Defendant as a "waitress".  In this regard, Plaintiff's job duties included, but were not limited to, receiving food orders from customers, delivering customers' food from the kitchen, and facilitating customers' payments for food orders.  Defendant correspondingly compensated Plaintiff on an hourly basis of $10.00 and she was eligible to receive a percentage of Defendant's customers' tips.

15.     Immediately from the outset of Plaintiff's employment, the general manager of the Facility, Latasha Whitehead (hereinafter, "Ms. Whitehead"), subjected Plaintiff to a hostile work environment.  Specifically, Ms. Whitehead would demand that Plaintiff "pick up the pace" and overextend herself, despite having express knowledge that Plaintiff was pregnant.

16.     Plaintiff further observed that Ms. Whitehead maintained preferential biases towards Caucasian employees and would enforce workplace rules to the female African American employees in a more strict and punitive manner, often subjecting them to arbitrary and capricious disciplinary measures that was above and beyond that necessary to accomplish any remedial objective.

17.     Upon information and belief, the racial makeup of Ms. Whitehead is a mixture of African American and Caucasian, and Ms. Whitehead appears to be predominately Caucasian in terms of core physical characteristics and traits.

18.     On or about January 2022, Plaintiff requested and received unpaid leave time to manage the birth of her child and to thereafter tend to the needs of her newborn (hereinafter, "Maternity Leave").

19.     On or about April of 2022, Plaintiff resumed her workplace duties at the Facility.

20.     Immediately following Plaintiff's return from Maternity Leave, Plaintiff observed a coworker, Daryl Jones (hereinafter, "Mr. Jones"), institute and perpetrate a pattern of sexual harassment toward herself and her African American, female coworkers.

21.     Specifically, Mr. Jones physically touched, in an unwelcomed and offensive manner, Plaintiff and her African American female coworkers without their consent.

22.     Further, on numerous occasions, Mr. Jones forcefully pushed female African American employees, including Plaintiff, into a commercial freezer and other secluded areas

and/or corners within the Facility, in order to isolate and subject them to physical and verbal sexual harassment.

23.    Additionally, Plaintiff was scheduled to work overlapping shifts alongside Mr. Jones.  In the course of these overlapping shifts, Mr. Jones made unwelcome and offensive sexual statements to Plaintiff which culminated in a racially and sexually hostile work environment.

24.    In particular, Mr. Jones made lewd statements concerning Plaintiff's physique and overt expressions of his desire to engage in sexual intercourse with her because he deemed her to be an attractive African American.

25.    Plaintiff reported the sexual harassment of Mr. Jones to Ms. Whitehead.  However, Ms. Whitehead refused to implement any rectifying measures because she and Mr. Jones were intimately and/or romantically involved with each other.

26.    Consequently, Plaintiff submitted a complaint regarding Mr. Jones's offensive sexual harassment to two of Defendant's human resource representatives, Jennifer Popovic (hereinafter, "Ms. Popovich") and John Swope (hereinafter, "Mr. Swope").

27.    Plaintiff also filed a complaint against Ms. Whitehead for failing to rectify the sexual harassment.

28.    However, Mr. Swope dismissed Plaintiff's complaint about Mr. Jones and refused to investigate the matter further because he alleged that Plaintiff did not provide conclusive and indisputable proof of the harassment.

29.    Shortly thereafter, in May 2022 and June 2022, several other African American employees of Defendant located at the Facility lodged complaints against Mr. Jones.  Additionally, in this time period, three (3) female employees, two (2) of which were African American, walked

out in the middle of their respective shifts to protest and evade the sexual harassment that Mr. Jones had inflicted upon them.

30.     In the middle of June 2022, Ms. Whitehead contacted Plaintiff via telephone to inform her that Defendant had terminated its employment relationship with Mr. Jones.

31.     Subsequently, Plaintiff expressed her interest in a vacant supervisory position with Defendant, which would have been a promotion from her then position as waitress.  However, Ms. Whitehead did not interview Plaintiff or afford due consideration to her request for a promotion.

32.     In June 2022, Plaintiff served customers at the Facility and their order was not properly prepared by Defendant's cook staff at the Facility.  In response, the customers inappropriately blamed Plaintiff and, when conveying their anger and frustrations, insulted Plaintiff with extremely offensive and derogatory racial remarks asserting that she possessed inferior mental traits and characteristics because she is African American.

33.     Immediately, Plaintiff requested that Ms. Whitehead take control of the situation. However, Ms. Whitehead failed to do so and, as a result, Plaintiff continued to serve the above-mentioned customers who, in turn, resumed their racial insults and epithets.

34.     Ultimately, after the customers departed the Facility, Plaintiff informed Ms. Whitehead that she would resign if Ms. Whitehead ever again required Plaintiff to serve customers that verbally abused her on the basis of her race.

35.     Beginning in July 2022, Plaintiff made several reports to Ms. Whitehead concerning potential health code violations at the Facility, specifically noting that customers were being served expired milk and the presence of readily observable mold in the Facility.  Ms. Whitehead brushed these reports aside.

36.     Plaintiff then lodged another complaint against Ms. Whitehead to Defendant's human resources department, specifically to Courtney Wood (hereinafter, "Ms. Wood") and Joscelin Gonzalez (hereinafter, "Ms. Gonzalez"), contending that Ms. Whitehead treated African Americans in a disparate and discriminatory manner and condoned the above-mentioned violations of the health code.

37.     In response to the above-mentioned complaint, Ms. Wood and Ms. Gonzalez informed Plaintiff that she could either transfer to Defendant's retail establishment located at 1002 Sutherland Drive, Pittsburgh, Pennsylvania 15205 (hereinafter, the "Robinson Facility") or be placed on an unpaid suspension.

38.     The next day, Plaintiff reported to the Robinson Facility and worked there for a full eight (8) hour shift.  Because the Robinson Facility was located a lengthy distance away from her personal residence, in comparison to the Facility, Plaintiff expended a significant amount of time traveling to and from the Robinson Facility.

39.     Perhaps inevitably, Plaintiff was physically exhausted from the travel time to and from the Robinson Facility and, following negotiations with Ms. Wood and Ms. Gonzalez, she was permitted to return to the Facility.

40.     In early February 2023, Plaintiff reported to her regularly scheduled shift at the Facility.   During her work shift, Plaintiff observed similarly situated Caucasian coworkers consuming food during their scheduled shifts.  This practice was known to and approved by Ms. Whitehead, and the similarly situated Caucasian coworkers were not disciplined or chastised for eating while "on the clock."

41.     As such, Plaintiff attempted to consume food while at the Facility when she was in between customers and on a preapproved rest period.   When Ms. Whitehead saw Plaintiff

10

consuming food, she publicly reprimanded Plaintiff, disciplined her in a humiliating fashion in front of coworkers, and discriminatorily sent Plaintiff home for the remainder of the day as punishment.

42.     Correspondingly, Plaintiff electronically reported Ms. Whitehead's discriminatory and retaliatory actions delineated above to Ms. Wood via an e-mail message.  Furthermore, Plaintiff reported to Ms. Wood that she was denied a promotion, despite her superior qualifications, in favor of a less qualified candidate who was Caucasian.

43.     On or about February 12, 2023, Plaintiff had an in-person meeting with Ms. Wood to further discuss the discriminatory and retaliatory environment perpetuated by Ms. Whitehead at the Facility.

44.     However, during that meeting, Ms. Wood concentrated on three (3) write-ups that were contained in Plaintiff's human resources file, authored by Ms. Whitehead (hereinafter, the "Write-Ups"), and dated February 9, 10, and 11 of 2023, respectively.

45.      Significantly, this was the first time the Write-Ups were brought to the attention of Plaintiff, and they all involved ministerial mistakes and/or relatively minor alleged violations of work rules, such as entering the incorrect employee identification number to clock in, using her phone while not on an approved break, and failing to attend a scheduled work shift.

46.     However, in response, Plaintiff relayed that (i) she had simply entered one number inaccurately when clocking in; (ii) similarly situated Caucasian coworkers routinely and regularly used the phone at work and not on an approved break; and (iii) Plaintiff obtained approval to change her scheduled work shift to a later point in the evening.

47.     Although Ms. Wood discussed the Write-Ups with Plaintiff, she did not impose any disciplinary action upon Plaintiff at the time of the February 12, 2023, meeting.  Moreover, Ms.

Wood dismissed, without consideration, Plaintiff's discrimination complaints against Ms. Whitehead and instructed Plaintiff to return to work.

48.     On February 14, 2023, Plaintiff observed a similarly situated Caucasian coworker, "Diana" (last name unknown at this time), who also worked as a waitress and performed the same job duties as Plaintiff, consume food while she was on the clock and working.  Plaintiff immediately reported this fact to Ms. Wood.

49.     On February 18, 2023, Plaintiff again observed Diana consuming food while she was on the clock and working, and Plaintiff instituted another report to Ms. Wood.

50.     Later in the work shift on February 18, 2023, Diana aggressively approached Plaintiff and shoved and pushed Plaintiff on the floor of the Facility in front of the customers, in apparent retaliation for complaining that Caucasian coworkers are permitted to eat while they work.

51.     Plaintiff immediately reported the behavior of Diana to both Ms. Whitehead and Ms. Wood.  However, neither Diana nor Ms. Whitehead responded to Plaintiff's complaints.

52.     Instead, Ms. Whitehead ordered Plaintiff to depart the Facility and return to her personal residence for the day.  Shortly thereafter, Ms. Whitehead, either on her own accord or at the directive of Ms. Wood, removed Plaintiff from the weekly work schedule.

53.     Fellow coworkers then called Plaintiff and explained that she was no longer on the work schedule.

54.     Thereafter, Plaintiff attempted to contact Ms. Wood and Ms. Whitehead by phone for several days after being taken off the schedule to inquire whether she was still employed with Defendant.  When neither Ms. Wood nor Ms. Whitehead returned these calls, Plaintiff considered herself to be effectively terminated from employment.

55.     Based on information and belief, Defendant, by and through either Ms. Wood or Ms. Whitehead, pretextually discharged Plaintiff because she incurred the Write-Ups.  However, unlike Ms. Wood, similarly situated Caucasian employees who engaged in materially indistinguishable conduct received discipline in a form that was substantially less than the drastic measure of termination.

56.     Alternatively, based on information and belief, Ms. Whitehead alone terminated Plaintiff because Plaintiff lodged discrimination complaints against her with Defendant's human resources department.

### COUNT I
### DISCRIMINATION ON THE BASIS OF RACE
### IN VIOLATION OF TITLE VII AND/OR THE PHRA
### 42 U.S.C. § 2000e, *et seq.* and 43 P.S. § 951, *et seq.*

57.     Plaintiff incorporates the above paragraphs, as if fully set forth at length herein.

58.     Plaintiff experienced discrimination based upon her race from the commencement of her employment through the time of her termination, as set forth above.

59.     Ultimately, as a result of the racial discrimination, Defendant terminated Plaintiff's employment.

60.     "In order to establish a *prima facie* case of racial discrimination, an employee must show that: (1) they are a member of a protected group; (2) they are qualified for the position at issue; (3) they were discharged or suffered some adverse employment action by the employer; and (4) they were treated less favorably than other similarly situated employees outside the protected group."  *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018) (internal citations and alterations omitted).

**A.     Plaintiff is a Member of a Protected Group.**

13

61.   At all times relevant hereto, Plaintiff was a member of a protected group insofar as Plaintiff is an African American individual.

**B.    Plaintiff was Qualified for the Position.**

62.   Plaintiff was qualified to perform the tasks and job duties of her position, as evidenced by her experience, and hiring by Defendant.

63.   Plaintiff possessed and exercised the skill, experience, and ability needed to perform the essential functions of her position.

64.   Specifically, Plaintiff was sufficiently skilled in the areas of comprehension, communication, and interpretation in order to carry out the essential functions of her position.

65.   Further, Plaintiff was able to comply with the physical demands of the position given the background Plaintiff possessed in similar roles.

**C.    Plaintiff Suffered Adverse Employment Actions and Was Treated Less Favorably than Similar Employees Outside Her Protected Class.**

66.   The actions set forth above, including but not limited to Plaintiff's termination, were actions not suffered by Plaintiff's similarly situated Caucasian coworkers, such as, (i) Ms. Whited's explicit preferential treatment towards them as set forth above, such as permitting Caucasian coworkers to consume food while at work but punishing/admonishing Plaintiff for doing the same; (ii) Plaintiff's denial of an opportunity to interview for a promotion as set forth above; and (iii) Plaintiff's lack of support or intervention from her supervisors in dealing with racially hostile customers.

67.   As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment

and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

### COUNT II
### HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF TITLE VII AND/OR THE PHRA
### 42 U.S.C. § 2000e, *et seq.* and 43 P.S. § 951, *et seq.*

68.	Plaintiff incorporates the above paragraphs, as if fully set forth at length herein.

69.	To establish a Title VII hostile work environment claim against an employer, a plaintiff must prove: (1) the employee suffered intentional discrimination, among other ways, because of their race or gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability.  *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (internal citations omitted); *see also, Sarullo v. US Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003).

**A.	Plaintiff Suffered Intentional Discrimination Because of Her Race.**

70.	As set forth above, Defendant, primarily through Ms. Whited, intentionally discriminated against Plaintiff on the basis of her race.

71.	The forms of race discrimination described above were so egregious and profoundly shocking that they, in and of themselves and apart from one another, constituted intentional race discrimination that was shockingly and extremely severe and pervasive for purposes of Title VII and the PHRA.

**B.	The Discrimination Was Sufficiently Severe and Pervasive that it Detrimentally Impacted Plaintiff and Would Have Negatively Impacted a Reasonable Person in Similar Situations.**

72.     The forms of discrimination occurred frequently and went uncorrected by Defendant, although Defendant was explicitly advised of the same.

73.     Plaintiff considered the inequitable treatment she received from Ms. Whited in comparison to her similarly situated Caucasian coworkers to be intentional race discrimination.

74.     Any reasonable person in the situation of Plaintiff would have been detrimentally affected if the actions of Ms. Whited were directed at any other African American individual in similar circumstances.

C.     *Respondeat Superior* **Liability Exists Given Defendant's Role and Refusal to Remediate the Hostile Work Environment.**

75.     The Third Circuit has held that an employer is vicariously liable "for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Hitchens v. Montgomery Cnty.*, 278 F. App'x 233, 236 (3d Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

76.     Further, a plaintiff "may demonstrate *respondeat superior* liability by providing evidence that their supervisor subjected them to a 'tangible employment action,' such as discharge, demotion, or undesirable reassignment." *Id*.

77.     Given the central role that Plaintiff's manager, Ms. Whited, played in Plaintiff's termination, Plaintiff can readily establish the existence of *respondeat superior* liability.

78.     As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment

and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

<u>**COUNT III**</u>
**UNLAWFUL RETALIATION ON THE BASIS OF PROTECTED ACTIVITY**
**IN VIOLATION OF TITLE VII AND/OR THE PHRA**
**42 U.S.C. § 2000e, *et seq.* and 43 P.S. § 951, *et seq.***

79.     Plaintiff incorporates the above paragraphs, as if fully set forth at length herein.

80.     It is well established that Title VII makes it illegal for an employer to discriminate against an employee because the employee opposed a practice made unlawful by Title VII.  *See* 42 U.S.C. § 2000e-3(a).

81.     To establish a claim for retaliation on the basis of race, Plaintiff must show, "(1) [that he engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (quoting *Fogleman v. Mercy Hosp. Inc.*, 283 F.3d 561, 567–68 (3d Cir. 2002)).

**A.     Plaintiff Engaged in "Protected Activities" Upon Reporting Racial Discrimination.**

82.     On numerous occasions during Plaintiff's tenure of employment with Defendant, Plaintiff complained to Ms. Wood and Ms. Gonzales, reporting the racial discrimination delineated above.

83.     It is axiomatic that "informal protests of discriminatory employment practices, including making complaints to management" constitute "protected activity" for purposes of a

retaliation claim pursuant to Title VII. *Swanger-Metcalfe v. Bowhead Integrated Support Servs., LLC*, No. 1:17-cv-2000, 2019 BL 120120, at *10 (M.D. Pa. Mar. 31, 2019) (citing *Slagle v. Cty. of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)).

84.     Accordingly, Plaintiff's complaints of racial discrimination constitute "protected activity" for purposes of her *prima facie* burden.

**B.     Plaintiff was Subjected to an Adverse Employment Action Contemporaneous with Her Protected Activity.**

85.     Subsequent to Plaintiff's initial complaints to Ms. Wood and Ms. Gonzalez f the racial discrimination she was experiencing at the hands of Ms. Whited, two suggested that Plaintiff transfer to a different retail establishment of Defendant's which was significantly of greater distance from Plaintiff's residence in comparison to the location of the Facility.

86.     Due to the unsustainable commute delineated above, when Plaintiff transferred back to the Facility and was met once again with racial discrimination at the hands of Ms. Whited, Plaintiff once again complained to Ms. Wood about the same.

87.     Contemporaneous with the foregoing, Ms. Wood presented Plaintiff with three Write-Ups, of which Plaintiff had previously been completely unaware.

88.     Shortly thereafter, Plaintiff levied an additional complaint with Ms. Wood relative to her similarly situated Caucasian coworkers being permitted to consume food while on the job.

89.     Within a short proximity of time thereafter, Plaintiff suffered the ultimate adverse employment action in that her employment relationship with Defendant was terminated.

**C.     A Causal Connection Between Plaintiff's Protected Activity and Defendant's Adverse Actions Readily Exists.**

90.     A causal connection readily exists between Plaintiff's protected activity and the adverse employment actions described above.

91.     The Third Circuit recognizes that a plaintiff can establish their protected activity was a "but-for cause of the alleged adverse action by the employer" by and through temporal proximity that is "unusually suggestive of retaliatory motive."  *Hukman v. Am. Airlines, Inc.*, 796 F. App'x 135, 142-143 (3d Cir. 2019) (citing *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338m 362 (2013); *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017)).

92.     Given the close temporal proximity that exists from, particularly the final time Plaintiff complained about racial discrimination, to the time Defendant instituted adverse employment action by terminating her, it is necessarily inferable that Defendant retaliated against Plaintiff for the complaints of racial discrimination.

93.     As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

### REQUEST FOR RELIEF

Plaintiff, Anna Russell, respectfully requests this Honorable Court to enter judgment in her favor, and against Defendant, IHOP Restaurants, Inc., and prays for relief as follows:

1.     Declare and find that Defendant committed one or more of the following acts:

        i.     Violated Title VII and/or the PHRA by discriminating against Plaintiff on the basis of her race;

    ii.    Violated Title VII and/or the PHRA by failing to correct a hostile work environment on the basis of her race; and

    iii.    Violated Title VII and/or the PHRA by retaliatorily terminating Plaintiff on the basis of her protected activity.

2.    Award compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life;

3.    Award equitable relief in form of back pay and front pay;

4.    Award liquidated damages sufficient to deter Defendant from engaging in future conduct of a similar nature;

5.    Award punitive damages sufficient to deter Defendant from engaging in future conduct of a similar nature;

6.    Award attorney's fees; and/or

7.    Award pre-judgment and continuing interest as calculated by the Court.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date: January 23, 2024    By: */s/ Erik M. Yurkovich*
    Erik M. Yurkovich (Pa. I.D. No. 83432)

    The Workers' Rights Law Group, LLP
    Foster Plaza 10
    680 Andersen Drive, Suite 230
    Pittsburgh, PA 15220

Telephone: 412.910.8057
Fax: 412.910.7510
erik@workersrightslawgroup.com

*Counsel for Plaintiff, Kristy Babik*

## **<u>VERIFICATION</u>**

I, Anna Russell, have read the foregoing allegations in the foregoing Complaint in Civil Action and verify that the statements therein are correct to the best of my personal knowledge, information and/or belief.  I understand that this verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities, which provides that if I knowingly make false averments, I may be subject to criminal penalties.

Dated: <u>01 / 23 / 2024</u>

*Anna Russell*

Anna Russell